IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

PAMELA TODD,                           )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )   CIVIL ACTION NO. 22-0211-MU
                                       )
KILOLO KIJAKAZI, Acting                )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela Todd brings this action, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), and seeks judicial review of a final decision of the Commissioner of Social

Security ("the Commissioner") which denies her claim for a period of disability and

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act")

and for Supplemental Security Income ("SSI"), based on disability, under Title XVI of the

Act. The parties have consented to the exercise of jurisdiction by the Magistrate Judge,

pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 12 ("In

accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in

this case consent to have a United States Magistrate Judge conduct any and all

proceedings in this case, … order the entry of a final judgment, and conduct all post-

judgment proceedings.")). *See also* Doc. 13. Upon consideration of the administrative

record, Todd's brief, the Commissioner's brief, and arguments made at the hearing on

this case, it is determined that the Commissioner's decision denying benefits should be **AFFIRMED**.[1]

## I.  PROCEDURAL HISTORY

Todd applied for a period of disability and DIB, under Title II of the Act, 42 U.S.C. §§ 423-425, and for SSI, based on disability, under Title XVI of the Act, 42 U.S.C. §§ 1381-1383d, on or about August 8, 2013, alleging disability beginning on March 27, 2012.[2] (PageID. 230-39). Her application was denied at the initial level of administrative review on September 19, 2013. (PageID. 141-62). On September 24, 2013, Todd requested a hearing by an Administrative Law Judge (ALJ). (PageID. 178-79). After a hearing was held on September 9, 2014, the ALJ issued an unfavorable decision finding that Todd was not under a disability from the alleged onset date, April 1, 2012, through the date of the decision, February 17, 2015. (PageID. 66-113). Todd appealed the ALJ's decision to the Appeals Council, and, on June 2, 2016, the Appeals Council denied her request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (PageID. 50-54).

Todd appealed the decision to this Court, and on December 22, 2017, United States Magistrate Judge William E. Cassady reversed and remanded the Commissioner's decision finding that the record was not fully developed as to her physical impairments because she had not yet been evaluated by a rheumatologist.

---

[1] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 12 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

[2] The alleged onset date was subsequently amended to April 1, 2012. (PageID. 88).

(PageID. 529-42). The ALJ scheduled an oral hearing for June 15, 2018, but continued it due to the need for a rheumatology CE. (PageID. 461-67). Subsequently, an oral hearing was held before the ALJ on February 15, 2019. (PageID. 468-503). On June 19, 2019, the ALJ issued an unfavorable decision finding that Todd was not under a disability from the alleged onset date, April 1, 2012, through the date of the decision. (PageID. 427-54).

Todd again appealed the ALJ's decision to this Court. *See Todd v. Saul,* Civ. A. No. 19-0846-B (S.D. Ala. 2019). After the Commissioner filed an unopposed motion for remand pursuant to sentence four of 42 U.S.C. § 405(g), United States Magistrate Judge Sonja F. Bivins granted the motion and reversed and remanded the claim to the Appeals Council with instructions for the ALJ to further develop the record, if necessary, to reconsider the severity of Todd's mental impairment, to reconsider and document the paragraph B criteria limitations in a manner consistent with regulations, to reconsider Todd's mental RFC, to obtain supplemental evidence from a vocational expert, if necessary, to offer Todd the opportunity for a hearing, and to issue a new decision. (PageID. 1149-50).

On January 29, 2021, the Appeals Council vacated the ALJ's decision and remanded Todd's claim to the ALJ with the instructions given by the Court. (PageID. 1153-54). After conducting a hearing on January 26, 2022, the ALJ issued a third unfavorable decision finding that Todd was not under a disability from the revised onset date, July 19, 2013, through the date of the decision, February 16, 2022. (PageID. 1020-63).

After exhausting her administrative remedies, Todd again sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner

filed an answer and the social security transcript on September 7, 2022. (Docs. 9, 10).
Both parties filed briefs setting forth their respective positions. (Docs. 16, 17). The parties
appeared before the Court for oral argument on March 1, 2023. (Doc. 22).

## II.  CLAIMS ON APPEAL

Todd alleges that the ALJ's decision to deny her benefits is in error for the
following reasons: 1) the ALJ failed to properly weigh the medical opinion evidence; 2)
the ALJ erred by failing to consider if her RFC precluded her from obtaining a job; 3) the
ALJ failed to properly develop the medical record; and 4) the ALJ failed to properly
evaluate her subjective statements. (Doc. 16 at p. 4; PageID. 1495).

## III. BACKGROUND FACTS

Todd was born on September 11, 1975, and was almost 38 years old at the time
she filed her claim for benefits. (PageID. 91). Todd initially alleged disability due to
arthritis, mitral valve prolapse, fibromyalgia, and early lupus. (PageID. 273). At the first
hearing, Todd testified that she is disabled due to sharp joint pain in her shoulders,
hands, wrists, knees, and feet; muscle soreness and spasms; insomnia; fatigue; joint
stiffness; headaches; chest pain and palpitations; and severe pain. (PageID. 96-102).
Todd graduated from college with a degree in nutrition. (PageID. 92-93). At the time she
filed her application, she was not working but had previously worked as an office clerk,
as a telecommunication salesperson, as a customer service representative for hospice
patients, and as a nutritionist. (PageID. 93-95).

Todd lives with her minor son who has autism and has cared for him since the
filing of her claim, including the management of his disability benefits. (PageID. 91-92,
473-75, 478). Todd testified at her initial hearing and at her hearing on February 15,

2019 that she has a drivers' license and drives her son to and from school and herself to
the grocery store and to her doctor appointments. (PageID. 473-74). Todd takes care of
her own personal hygiene, helps her son get ready for school, and makes breakfast in
the mornings. (PageID. 474-75). After dropping off her son, she runs errands or returns
home and rests or does light household chores, such as washing dishes, dusting,
laundering, vacuuming, etc., depending on her level of pain or stiffness. (PageID. 475-
76). She cannot do yard work. (PageID. 476).

At the hearing on January 26, 2022, Todd testified that, because of her
fibromyalgia, she experiences fatigue; has all over body aches and pains, joint pain,
muscle pain, dizziness, poor appetite, nausea, difficulty walking because of numbness in
her feet, and lower back and neck pain; inability to regulate her body temperature which
results in fevers or extremely cold hands and feet; has tenderness to touch in the joints
of her fingers, her elbows, her knees, and in her right hip; has cysts in the joints on her
wrists, has headaches weekly; has memory problems that have gotten worse, and has
had no improvement over time. (PageID. 1080). Todd testified that the pain she
experiences, after medication, is an 8 out of 10 and that if affects her ability to
concentrate and focus. (PageID. 1084).  She further testified that she can only stand or
walk for 10 to 15 minutes at a time and can only sit upright for about 10 minutes at a time
because it causes swelling in her arms, feet, and ankles. (PageID. 1085). She testified
that she spends two to two and a half hours during the day laying in her recliner.
(PageID. 1086).

## IV. ALJ'S DECISION

After conducting the January 26, 2022 hearing, the ALJ made a determination that

5

Todd had not been under a disability during the relevant time period and thus was not
entitled to benefits. (PageID. 1023-27). Because Todd filed for DIB, as well as SSI, the
ALJ initially found that she met the insured status requirements of the Act through
September 30, 2013. (PageID. 1027). At step one of the five-step sequential evaluation,
the ALJ found that Todd had not engaged in SGA since July 19, 2013, the alleged onset
date. (*Id.*). Therefore, she proceeded to an evaluation of steps two and three. The ALJ
found that Todd had severe impairments of fibromyalgia, chronic pain syndrome, heel
spurs, paresthesias, anxiety, cardiac arrhythmias/mitral valve prolapse, and
endometriosis, but that considering all her impairments individually and in combination,
Todd did not have an impairment or combination of impairments that met or medically
equaled the severity of a listed impairment. (*Id.*). After considering the entire record, the
ALJ concluded that Todd had the RFC to perform sedentary work, with some exceptions:
could perform at least simple routine repetitive tasks with occasional contact with the
public, supervisors and coworkers; occasional adaptation to new tasks or workplace
changes, no rapid paced or high production quota activities such as assembly line;
limitations to tasks involving things rather than people; occasionally lift and carry up to 20
pounds, and frequently lift and carry up 10 pounds; sit for seven hours out of an eight-
hour day, alternate to standing for 5 minutes after every 1 hour of sitting; walk for 3 hours
out of an eight-hour day with the ability to alternative to sitting after every 1 hour of
walking; occasionally operate foot controls and hand controls; frequently reach in all
directions; frequently finger; occasionally climb ramps and stairs; never climb ladder,
ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never work at
unprotected heights; occasionally work around dangerous moving mechanical parts,

6

occasionally operate motor vehicles, occasionally be exposed to weather, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and heat, and vibrations; and loud noise environment. Claimant would be absent from work one day per month and off task 5% of the time. (PageID. 1034). After setting forth her RFC, the ALJ determined that Todd is not capable of performing past relevant work. (PageID. 1061). However, after considering her age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Todd can perform. (*Id*.). Accordingly, the ALJ concluded that Todd was not disabled within the meaning of the Act. (PageID. 1062).

## V. DISCUSSION

Eligibility for DIB and SSI benefits requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1)-(2). A claimant is disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In evaluating whether a claimant is disabled, the ALJ utilizes a five-step sequential evaluation:

> (1) whether the claimant is engaged in substantial gainful activity;
> (2) if not, whether the claimant has a severe impairment; (3) if so, whether

the severe impairment meets or equals an impairment in the Listing of
Impairment in the regulations; (4) if not, whether the claimant has the RFC
to perform her past relevant work; and (5) if not, whether, in light of the
claimant's RFC, age, education and work experience, there are other jobs
the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam)

(citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)(f); *Phillips v. Barnhart,* 357

F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of

proving the first four steps, and if the claimant does so, the burden shifts to the

Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir.

1999). The steps are to be followed in order, and if it is determined that the claimant is

disabled at a step of the evaluation process, the evaluation does not proceed to the next

step.

When a claimant appeals an unfavorable ALJ decision, the reviewing court must

determine whether the Commissioner's decision to deny benefits was "supported by

substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc.*

*Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g).

"Substantial evidence is more than a scintilla and is such relevant evidence as a

reasonable person would accept as adequate to support a conclusion." *Winschel*, 631

F.3d at 1178 (citations omitted).   "In determining whether substantial evidence exists,

[the reviewing court] must view the record as a whole, taking into account evidence

favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*,

792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew,

reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*.

When a decision is supported by substantial evidence, the reviewing court must affirm

"[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Todd alleges that the ALJ's decision to deny her benefits is in error for the following reasons: 1) the ALJ failed to properly weigh the medical opinion evidence; 2) the ALJ erred by failing to consider if her RFC precluded her from obtaining a job; 3) the ALJ failed to properly develop the medical record; and 4) the ALJ failed to properly evaluate her subjective statements. (Doc. 16 at p. 4; PageID. 1495).

## A. Weight Accorded to Medical Opinions

Todd argues that the ALJ erred by according "very little weight" to the opinions of her treating board-certified internist, Dr. Clower, while according "considerable weight" to the opinions of a one-time consultative examining physician, Dr. Freij, and "partial weight" to the opinions of a second consultative examiner, Dr. Adediji. (Doc. 16 at pp. 7-8). The Commissioner argues that the ALJ did not err because the ALJ followed and applied the applicable standards in making these determinations based on the totality of the evidence in the record. (Doc. 17 at pp. 10-14).

The relevant social security regulations[3] provide that "medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [their] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). "When weighing each medical opinion, the ALJ must consider whether the doctor has examined the claimant;

---

[3] Because Todd filed her claim for social security benefits prior to March 27, 2017, the applicable rules for evaluating medical opinion evidence are set forth in 20 C.F.R. § 404.1527. *See* 20 C.F.R. §§ 404.614, 404.1527.

the doctor's relationship with the claimant; the medical evidence supporting the doctor's opinion; how consistent the doctor's opinion is with the record as a whole; and the doctor's specialization." *Muniz v. Comm'r of Soc. Sec.*, 716 F. App'x 917, 919 (11th Cir. 2017) (citing 20 C.F.R. § 416.927(c)); *see also Nichols v. Comm'r, Soc. Sec. Admin.*, No. 16-11334, 2017 WL 526038, at * 5 (11th Cir. Feb. 8, 2017) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)) (stating that "[i]n determining how much weight to give a medical opinion, the ALJ considers such factors as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization").

A review of the entire record in this case reveals that the ALJ was presented with multiple opinions, testimony, and medical records setting forth Todd's diagnoses and to a lesser extent indicating her functional limitations. The ALJ discussed the medical evidence in detail, including the weight accorded to the medical opinion evidence and the grounds therefor. (PageID. 1040-56). As the ALJ has included an in-depth review of Todd's medical records in her Decision, a review of those records will not be repeated here. Todd's primary complaint with regard to the weighing of the medical evidence is that it was improper for the ALJ to accord little weight to the opinions of Dr. Clower concerning the level of her functional impairment while giving considerable weight to Dr. Freij's opinions. (Doc. 13 at p. 4).

It is well established that determination of whether a claimant is disabled from doing gainful work is an issue reserved to the Commissioner, and a doctor's opinion on that issue can be disregarded. *See Lowery v. Berryhill*, Civ. A. No. 4:16-cv-00913-AKK, 2017 WL 1491274, at *3 (N.D. Ala. Apr. 26, 2017) (citing *Pate v. Comm'r, Soc. Sec.*

*Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017) ("the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner.")); *see also Green v. Soc. Sec. Admin.,* 223 F. App'x 915, 923 (11th Cir. 2007) (holding that "the ALJ will evaluate a [physician's] statement [concerning a claimant's capabilities] in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ). A physician's opinion as to a claimant's ability to work is not entitled to recognition from an ALJ if the opinion is not supported by or consistent with the totality of the evidence. *Id*. "In assessing whether a claimant is disabled, an ALJ must consider the medical opinions in a case record *together with the rest of the relevant evidence received*." *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 870 (11th Cir. 2016) (citing 20 C.F.R. § 404.1527(b)) (emphasis added). The ALJ is to consider the claimant's daily activities when evaluating the symptoms and severity of an impairment. *Id*. at 871 (citing 20 C.F.R. § 404.1529(c)(3)(i)). "[T]he more consistent an opinion is with the record as a whole, the more weight the ALJ will give to that opinion." *Id.* (citing 20 C.F.R. 404.1527(c)(4)).

Although the opinions of treating physicians are generally entitled to substantial or considerable weight, the ALJ is not required to give a treating physician's opinion considerable weight if good cause is shown to the contrary. *See Phillips v. Barnhart,* 357 F.3d 1232, 1240 (11th Cir. 2004). The Eleventh Circuit "has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41. Also, if the claimant's own testimony regarding the claimant's daily activities contradicts the

consulting physician's opinion, the ALJ's decision to refrain from giving the physician's opinion considerable weight is not in error. *See Chambers*, 662 F. App'x at 872. Indeed, "an ALJ may reject any medical opinion if the evidence supports a contrary finding." *Nichols,* 2017 WL 526038, at *5 (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

The ALJ properly set forth the applicable standards to evaluate a treating physician's opinions in her Decision. (PageID. 1058). She then analyzed the weight to be accorded Dr. Clower's opinions as follows:

Dr. Clower submitted a Physical Capacities Evaluation (PCE) and a Clinical Assessment of Pain (CAP) dated October 28, 2013 (Exhibit B2F), a MQRL dated "7-1-21" (Exhibit B26F at 5), another MQRL, this one dated "7-26-21" (*Id*. at 3), another CAP form dated "7-1-24" [sic] (*Id*. at 4), and yet another CAP form dated "7-1-21" (*Id*. at 2), all of which appear to greatly overstate Claimant's limitations.  Every visit Claimant has made to Dr. Clower's office has been cited above.  Dr. Clower's findings on examination are simply inconsistent with the severe limitations he identifies.  For example, based on his PCE Claimant is able to stand and walk for a total of only one hour out of eight, she would be spending seven hours out of eight off her feet; yet, his examinations reveal that she retains normal lower extremity muscle strength and tone with no evidence of even minimal muscle atrophy from disuse.  Surely there would be evidence of muscle atrophy in Claimant's leges [sic] if she could stand and walk for only for a total of only one hour out of eight.  Dr. Clower indicates that she is unable to use her arms for pushing or pulling, cannot perform fine manipulation at all, and can perform gross manipulation only rarely; however, his examinations consistently document findings of normal upper extremity strength and tone.  He opined that Claimant can lift and/or carry 10 pounds occasionally to 5 pounds frequently; sit for total of only two hours in an eight-hour workday; is unable to bend, stoop, or work with or around hazardous machinery; can rarely perform gross manipulation, balance,  reach (including overhead) and climb stairs or ladders; and can occasionally operate motor vehicles.  Dr. Clower identified lupus, rheumatoid arthritis, and mitral valve prolapse as the bases for the restrictions indicated and predicted that Claimant would be absent from work four days per month as the result of her impairments or treatment.  As previously discussed, Dr. Clower's diagnoses of rheumatoid arthritis and lupus are rejected because Dr. Ayers, Dr. Lawrence, Dr. Maneice, and Dr. Silverman, all rheumatologists, found no evidence of systemic lupus

erythematosus or rheumatoid arthritis.  As previously cited, examination findings have been remarkably benign—even on those visits when Claimant has had specific complaints of pain.  Claimant's gait and station are consistently normal, and there is no evidence of swelling, edema, or significant deformities.  Inspection/palpation of her digits produces normal findings, and she exhibits normal range of motion of her major joints, including the knees, ankles, elbows, wrists, and hands.  Examinations of the upper and lower extremities produced normal results as well with no evidence of decreased range of motion, asymmetry, tenderness, or swelling and normal stability, strength, and tone.  While Claimant does have mitral valve prolapse, it appears to be well controlled with medications, as Dr. Clower's examination findings have been minimal.

Claimant's self-reported daily activities also contradict Dr. Clower's opinion (Exhibits B5E, B7E).  While he opines that she is unable to perform fine manipulation and can rarely use her hands for grasping, twisting, and handling, she reports that she sews and does crafts, works crosswords puzzles, plays board games, uses a computer keyboard, bathes and dresses her son, uses clippers when working in the yard, cooks, irons, sweeps, dusts, does laundry, etc.  Dr. Clower opines that physical activity—even sitting-cause such an increase in Claimant's pain that she requires bed rest or medication.  Although the undersigned finds it reasonable that Claimant might have to pace herself when performing housework or playing with her son, even Claimant does not allege that those activities so increase her pain that she is bedridden or requires pain medications afterwards.  In fact, there is no evidence that Claimant has been prescribed strong pain medications.  Her records show that she uses has used prednisone on occasion for lupus flares but infrequently, and she currently relies on only over-the-counter pain medications.  Dr. Clower's opinion that Claimant would miss work frequently (four days a month) due to her impairments is inconsistent with her ability to serve as caregiver to a disabled child every day without assistance and with the daily activities she describes.  Dr. Clower submitted a letter along with the PCE and CAP in which he writes that it is his medical opinion that Claimant is totally and physically disabled.  The issue of whether an individual is disabled under the Social Security Act is reserved to the Commissioner of Social Security. At the hearing level, the administrative law judge is responsible for making the determination regarding disability (20 CFR 404.1429 and 416.929).  20 CFR 404.1527 and 416.927 state that opinions reserved to the Commissioner are not medical opinions.  The undersigned always carefully considers medical source opinions about issues that are reserved to the Commissioner as required under 20 CFR 404.1527(e) and 416.927(e) and Social Security Ruling 96-5p.  Very little weight is accorded to the letter for the same reasons stated above in the discussion of the PCE, MQRL, and CAP forms.

> Dr. Clower submitted another letter, dated June 21, 2018 (Exhibit B17F),
> and yet another dated, March 10, 2021 (Exhibit B19F/2), in which he
> stated that Claimant that it is his medical opinion that Claimant is totally
> and physically disabled, and only functioning at 10-20%. Very little weight
> is accorded to the letters for the same reasons stated above in the
> discussion of the PCE, MQRL, and CAP forms.

(PageID. 1058-59).

As set forth in the ALJ's Decision, Dr. Clower opined that Todd had severe

physical limitations, yet evidence in the record showed that she was able to take care of

her activities of daily living, took care of her autistic son, was able to drive and did so, did

light housekeeping, had a college degree, and had worked at various jobs. As pointed

out in the ALJ's Decision and exhibited by the totality of the evidence, Dr. Clower's

opinions were also inconsistent with the findings and opinions of other treating,

consultative, and reviewing physicians and inconsistent with his own examination

records. Therefore, the Court finds that the ALJ did not err in her assessment of the

weight to be accorded Dr. Clower's opinions because substantial evidence supported the

ALJ's finding that Dr. Clower's opinions that were expressed in his numerous PCE, etc.

forms and opinion letters were not in line with Todd's own testimony, Dr. Clower's own

reports, or the record as a whole.

Todd also finds fault with the ALJ giving the opinions of Dr. Freij, a consultative

examining neurologist, considerable weight. The Eleventh Circuit has recognized that

where substantial evidence supports an ALJ's decision to assign great weight to a non-

examining physician, even if it is greater weight than is given to a treating doctor, the ALJ

may permissibly do so. *See Forsyth v. Comm'r*, 503 F. App'x 892, 893 (11th Cir. 2013);

*see also* 20 C.F.R. § 404.1527(c), (e); 56 Fed. Reg. at 36,936-37, 36,953, 36,969; *Willis*

*v. Comm'r of Soc. Sec.,* No. 3:09-CV-297-J-20MCR, 2010 WL 3245449, at *7 (M.D. Ala.

Aug. 17, 2010) (affirming ALJ's reliance on non-examining physicians' opinions despite conflict with examining physicians' opinion). This rule is equally (if not more) applicable to this case where Dr. Freij examined Todd on January 5, 2018. His examination, which was consistent with many, if not most examinations performed by various physicians, revealed tenderness over the muscles of her shoulders, normal gait, no limitation of range of motion in her cervical, lumbosacral, or thoracolumbar spine, 90-degree bilateral straight leg raise, 5/5 motor power throughout, and no edema, cyanosis, or clubbing in the extremities. (PageID. 1045). Dr. Freij agreed with the diagnosis of fibromyalgia. (*Id.*). Dr. Freij completed a Medical Source Statement that contained functional limitations in line with those ultimately assessed by the ALJ.  In giving Dr. Freij's MSS considerable weight, the ALJ supported her assessment by stating that his opinion was "generally well supported by his own clinical examination and testing" and was "largely consistent with the record as a whole." (PageID. 1058). The ALJ did note that Dr. Freij's opinion was "deficient insofar as he did not address [Todd's] need to alternate sitting and standing." (*Id.*). Based upon a review of Todd's multiple reports of daily activities and her complete medical history, the Court finds that the ALJ's decision to afford considerable weight to Dr. Freij's opinion was based on substantial evidence and proper application of the relevant law.

Based on its review of the ALJ's decision and the record, the Court finds that the ALJ properly applied the appropriate standard in evaluating the weight to be accorded these medical opinions.

**B.  RFC Finding**

Todd argues that the ALJ erred by failing to consider if the assigned RFC precluded her from obtaining a job. Specifically, Todd contends that the ALJ erred by failing to elicit vocational expert evidence supporting a finding that Plaintiff could maintain a job if she missed work one day a month during a potential probationary period. (Doc. 16 at pp. 13-14). The Court has reviewed the vocational expert's testimony and finds Todd's contention in this regard without merit. The ALJ specifically asked the vocational expert if Todd could "maintain competitive employment" with her limitations if she was "absent one day per month and off task five percent of the day." (PageID. 1107). The vocational expert responded that she believed Todd could work as an addresser, an eyeglass frames polisher, or a sorter with those limitations. (PageID. 1106-07). Upon questioning by Todd's counsel as to whether there are no tolerances for absences during a probationary period, the vocational expert testified that it is "extremely up to the employer" and that some employers are willing to work with probations with an absence and some are not. The Court finds that the Commissioner met her burden of showing that there are jobs that Todd can perform with her RFC, age, education, and work experience, as required by the fifth step of the analysis.

**C. Failure to Develop Medical Record**

On the first appeal to this Court of her denial of benefits, Todd claimed that the ALJ erred by failing to fully develop the record by choosing not to re-order a rheumatologic evaluation. (PageID. 534). Acknowledging that "[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for

him to make an informed decision," *Reeves v. Heckler,* 734 F.2d 519, 522 n.1 (11th Cir.

1984), Magistrate Judge Cassady stated:

> After thoroughly reviewing the medical records, the Court finds the ALJ erred in failing to fully develop the record in regard to the extent of Todd's physical impairments. The record indicates Todd's treating physician, Dr. Clower, believed she needed to be evaluated by a rheumatologist and Dr. Adediji's evaluation was performed without the results of a rheumatologic evaluation. Therefore, the record was not fully developed for the ALJ to make an informed decision.

(PageID. 539).

After this Court's remand, a rheumatologist, Dr. Maneice, examined Todd on May

10, 2018, and performed laboratory testing and x-rays. (PageID. 980-88). Dr. Maneice

stated that it is her medical opinion that Todd has chronic pain due to fibromyalgia and

no evidence of rheumatoid or any type of inflammatory arthritis. She diagnosed her with

fibromyalgia, heel spurs, Vitamin D deficiency, and paresthesias. (PageID. 980). The

ALJ cited to and relied on this examination to support her decision. (PageID. 1046-47,

1052-55, 1057-58). In addition to Dr. Maneice's medical opinion, Dr. Silverman, a board-

certified rheumatologist, reviewed Todd's medical records and provided expert testimony

confirming Dr. Maneice's diagnoses and offered her opinion on any impairment caused

by these diagnoses. (PageID. 1095-1102).

Based on the foregoing, the Court finds that the Commissioner fully complied

with Judge Cassady's remand order by providing Todd with a consultative examination

by a rheumatologist, Dr. Maneice, and presenting expert testimony from a

rheumatologist, Dr. Silverman, at the hearing. While this Court found a consultative

examination was necessary, the Court did not require the consulting doctor to provide a

Medical Source Statement. (PageID.537-39). The ALJ was provided with the opinions of

both of these rheumatologists to assist her in making an informed decision. Therefore, Todd's claim of error for failure to comply with the earlier remand order is without merit.

## D. Failure to Properly Evaluate Todd's Subjective Statements

Todd also contends that the ALJ erred because her evaluation of Todd's subjective statements is not supported by substantial evidence. In her decision, the ALJ found that Todd's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence, and limiting effects of these symptoms are not consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (PageID. 1040).

Pursuant to Social Security Regulation 16-3p, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2017 WL 5180304 at *2 (Oct. 25, 2017). The ALJ must use a two-step process for evaluating a claimant's symptoms. At Step 1, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *3. "An individual's symptoms, such a pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to perform work related activities... unless medical signs or laboratory findings show a medically determinable impairment is present." *Id.* These medical signs and laboratory findings are called "objective medical evidence." *Id.* The claimant must present "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to

produce an individual's alleged symptoms." *Id.*

Once the ALJ finds that the claimant has a medically determinable impairment, the ALJ considers Step 2 of the process. At Step 2, the ALJ evaluates "the intensity and persistence of an individual's symptoms such as pain [to] determine the extent to which an individual's symptoms limit his or her ability to perform work related activities...." *Id.* at *4. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examines the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  *Id.* In addition to this evidence, the ALJ also uses the factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3) to evaluate the intensity, persistence, and limiting effects of an individual's symptoms. These factors are:

> 1) Daily activities;
> 2) The location, duration, frequency and intensity of pain or other symptoms;
> 3) Factors that precipitate and aggravate the symptoms;
> 4) The type, dosage, effectiveness, and side effects of any medication that individual takes or has taken to alleviate pain or other symptoms;
> 5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6) Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7) Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8. SSR 16-3p provides that the ALJ "will explain which of an individual's symptoms [the ALJ] found consistent or inconsistent with the evidence in [the claimant's record and how [the ALJ's] evaluation of the individual symptoms led to [the ALJ's]

conclusions." *Id.* at *8. The ALJ "will evaluate an individual's symptoms considering all the evidence in [the claimant's] record." *Id.*

The ALJ found that Todd met Step 1; therefore, she proceeded with an analysis of Step 2. Applying the above instructions to her analysis, the ALJ reviewed Todd's subjective statements as follows:

> On the "Function Report-Adult" dated September 7, 2013, Claimant alleges that her conditions, including pain, stiffness, swelling, and fatigue, affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, concentrate, and complete tasks. Claimant reports that she is able to walk a block or more before she has to rest for 10 or 20 minutes, depending on how she feels. Despite having written that her condition affects her ability to concentrate, Claimant wrote that she could pay attention for as long as needed. Regardless of having written that her condition affects her ability to complete tasks, Claimant wrote that she finishes what she starts (Exhibit B5E at 6).

> Claimant completed a form dated September 19, 2013, in which she describes difficulties using her hands. Claimant reports difficulty with putting on socks and shirts and tying shoelaces. Alleged stiffness and pain in her hands and fingers purportedly make it difficult to roll and pull on socks, tie shoelaces, and button shirts and pants. She reportedly sometimes wears slip on shoes that do not require tying shoelaces. Claimant reports having difficulty reaching up and holding a comb or brush to do her hair (Exhibit B7E at 2). She reportedly prepares meals consisting of items such as sandwiches, salads, frozen fish, fresh vegetables, baked meats, and stir-fry meals in a skillet or pan. She sometimes prepares frozen dinners. Claimant advises that she sometimes has difficulty opening packages for meals. She reportedly cannot hold boilers or pans for long periods while preparing meals. There are times when she has reportedly dropped plates or boilers. Claimant performs other household activities such as dusting, sweeping, cleaning, ironing, laundry, dishwashing, and taking out the trash. Claimant reports having difficulty squeezing/rinsing out a mop because of pain and stiffness in her hands. She limits the time she spends on each household chore. She does not have any difficulty using her hands when driving. (*Id.* at 3). In her spare time, she watches television, works crossword puzzles, plays board games, and does sewing/crafts. She does not have difficulty grasping or turning a doorknob but reports having difficulty writing with a pen or pencil and using a keyboard. Claimant reports having some limitations with cutting using scissors and clippers for yard work and flower

gardening.  Claimant also reports having some limitations with carrying and picking up grocery bags or heavy items from the store.  (*Id*. at 4).

On the "Disability Report – Appeal - Form SSA-3441" received on September 25, 2013, Claimant reports that her condition had changed on approximately September 17, 2013, insofar as she had begun having chest pain four days a week and more trouble using both hands (Exhibit B8E at 1).  She was reportedly having a hard time raising her arms to do her hair.  Claimant reports that on some days, she cannot hold a brush or comb and has problems putting on her socks and buttoning buttons.  She had reportedly begun to need more help with household chores.  (*Id*. at 4).

On the "Function Report-Adult" dated August 31, 2016, alleges that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, concentrate, remember, and complete tasks.  Claimant advises that she can lift only 5-10 pounds.  She can reportedly walk about one block before she has to stop and rest for 10 to 20 minutes (Exhibit B14E at 6).  She uses a doctor prescribed brace/splint as needed to help reduce pain.  (*Id*. at 7).

On the "Claimant Cardiovascular Questionnaire," dated September 2, 2016, Claimant reports that she walks regularly for exercise when she feels well enough.  There had been change in her everyday exercise because pain and stiffness would reportedly no longer let her walk far anymore before feeling fatigued or exhausted.  Claimant advises that she can walk for a block or more in about 5 to 7 minutes, depending on how she feels.  Claimant alleges chest pain or other discomfort when she does a lot of walking, jogging/running, stair climbing, or squatting.  Sweeping, pushing the vacuum cleaner, doing yardwork, raking, and heavy lifting, purportedly cause the same kind of discomfort.  Claimant reports that she feels the discomfort in her chest, and joints and muscles in her arms, legs, back, and feet (Exhibit B15E at 2).  Claimant reports that the discomfort lasts between one and several days.  Resting for a few hours to several days relieves the discomfort.  She takes Ativan.  Her shortness of breath is reportedly caused by anxiety and overexertion when walking, sweeping, doing yard work, and congestion.  She sits and rests to relieve shortness of breath.  She does not take any kind of medication for shortness of breath.  She sleeps on at least three pillows or has to sleep in a recliner due to pain, stiffness, and difficulty breathing.  She does not wake up at night with shortness of breath.  (*Id*. at 3).

Claimant's allegations during hearing testimony on February 15, 2019, are documented at (Exhibit B26B)

Claimant's representative submitted an On the Record Request dated February 25, 2021, requesting an on the record decision finding that Claimant has been disabled since July 19, 2013, due to the combination of

fibromyalgia, cardiac arrhythmias/mitral valve prolapse, endometriosis, anxiety, and heel spurs, which purportedly have rendered her unable to perform continuous work activity on a regular and continuing basis (Exhibit B29B).

Jewel White Thornton, a family friend, submitted a statement dated March 29, 2021, in which she alleges that Claimant has lupus and fibromyalgia, with aching joints, muscular and skeletal pain, headaches, fatigue, and depression.  Ms. Thornton writes that Claimant symptoms occur at debilitating levels several times throughout each week.  Ms. Thornton also alleges that Claimant is unable to perform such daily tasks as transporting her autistic son to school or medical appointments.  She purportedly cannot grocery shop, work, or pay for necessary healthcare and medication to treat her conditions (Exhibit B30E).

Lillie Simpson submitted a statement dated April 15, 2021, in which she states that she is a friend who has known Claimant for over ten years.  Ms. Simpson alleges that Claimant suffers with lupus, fibromyalgia, and heart conditions, and that she is totally physically disabled due to those conditions.  Claimant is purportedly always in a lot of pain and can only function at ten to fifteen percent (Exhibit B32E).

Claimant's allegations during hearing testimony on January 26, 2022, are summarized below.

Dr. Clower has treated her at Selma Doctors Clinic from 2012 through the present.  She has no medical insurance and has to pay Dr. Clower when she goes to see him.  There are times she cannot pay, and that causes problems seeing the doctor.

I have fibromyalgia, fatigue, all over body aches and pain… joint pain, muscle pain, stiffness, nausea problems with appetite, pain in her feet, difficulty walking, lower back pain, neck pain.  I haven't been able to regulate my body temperature. Is either have fevers or am extremely cold…hands and feet…having tenderness in joints, fingers, and elbows knees, right hip.  I've developed cysts in the joints of my wrists.  I have headaches frequently.  I've been having problems remembering.  It's been horrible all this time and has gotten worse.

The fibromyalgia pain is like a sharp, shooting pain, or a tenderness and dull aching in her elbows and knees.  I have stiffness that persists throughout the day every day.  I have fatigue that causes me to feel completely exhausted, not having the energy to do anything.

I was diagnosed with Raynaud's syndrome in 2012.  It causes numbness of her fingertips, feet and toes, and blueness in my nail beds.  My hands and feet feel like ice.  This affects my mobility and causes difficulty moving

around.  I have problems with fever and not being able to regulate her body temperature.  I have to take something for fever.  After taking something for fever, I have to rest.  I make sure to drink a lot of water to help with fever.  I have problems with both hands, and cannot use them frequently and repetitively for doing tasks.  Doing so makes the pain worse.

I had problems with endometriosis for which I had several surgeries.  I have lower abdominal pain and a very heavy menstrual cycle that lasts 7 to 14 days.  This causes anemia which affects my blood, so I have to take iron and frequent breaks. I have to rest in a reclining position.  I am not able to lie flat in a bed and have to sleep in a recliner in a reclining position.  If I don't, my heart races, I get short of breath, and have pain because of mitral valve prolapse when lying flat.  I have had heart palpitations the whole time.  It's like a racing heartbeat.  I get very tired and have chest pain and tenderness with shortness of breath.  That causes anxiety, which is stressful.
I have difficulty sleeping at night.  It's hard for me to fall asleep, and when I do it's off and on for between two and four hours.  Lack of sleep leaves me exhausted all day.  Being tired makes the pain worse.

Anxiety makes me feel short of breath jittery, shaky.  My hands start sweating, and I get an upset stomach.  I've been been breaking out in welts and rashes.  I have itches, and feels tense, on edge.  It makes me worry, freeze, and be unable to do anything.  I was trying to find a place to get help with anxiety back in 2013 but was not aware of anywhere to go.  I had not been treated for anxiety until I started receiving treatment locally from Cahaba Mental Health in 2021.  It is very hard to get in; it took six months to get an appointment.  It's not like I didn't try; it is hard to get into these places.  I talked to my doctor about it.

The pain is 8 on a scale from 0 to 10.  The pain affects my ability to focus and function.  I have problems remembering things.  I'm so focused on the pain and wanting relief that I'm not able to concentrate on anything else.  I take ibuprofen or Tylenol back-and-forth, use a heating pad daily, and use Voltaren cream to help with the pain.

I can stand or walk for 10 to 15 minutes at one time, but after that start feeling pressure in my feet and have to sit.  I can sit upright in a chair with my legs down for about 10 minutes at most.  I have to recline during the day every day because of a lot of swelling in feet and ankles.  I sit in a recliner with the back as far as it will go and with feet up from 8:00 to 5:00.  I have not had insurance to get the care or tests I need.

The undersigned has also carefully considered Claimant's reported activities of daily living.  On the "Function Report-Adult" dated September

7, 2013, Claimant reports that that from the time she awakens until the time she goes to bed, she takes care of her personal care, gets dressed, awakens her child, dresses him, and prepares breakfast. On school days, she takes her son to school and pick them up. She runs errands, does housework, and does daily activities with the child. She prepares snacks and dinner. She watches television with her family, reads, and then prepares for bedtime (Exhibit B5E at 1). She does everything for her child and also helps her grandmother as needed. Her sleep is reportedly disturbed by insomnia, pain, and stress. Claimant reports sometimes having difficulty bathing and getting dressed due to pain and stiffness. She reportedly sometimes has difficulty reaching in order to care for her hair. No problems are indicated with shaving, feeding herself, or using the toilet. (*Id*. at 2). She prepares sandwiches, frozen dinners, salads, and complete meals. She does household chores such as cleaning, laundry, ironing, sweeping, and dusting. She does not need encouragement to do those chores. (*Id*. at 3). She goes outside almost every day. She drives a car, rides in a car, or walks when she travels. She is able to go out alone. She shops once or twice a week in stores, by phone, by mail, and by computer for items such as groceries, clothes, shoes, toys, books, and household and personal items. She is able to pay bills, count change, handle a savings account, and use a checkbook. (*Id*. at 4). Her hobbies include sewing/crafts, reading, and watching television. She spends time talking and going out to eat with others. She participates in activities and outings with her child. She attends church, meetings, and school events. (*Id*. at 5).

In his narrative report of consultative internal medicine examination of Claimant dated November 21, 2014, Dr. Adediji reports that Claimant is able to do personal care. Claimant is able to prepare meals and do housekeeping activities like laundry, mopping and vacuuming. Claimant has trouble doing heavy lifting or yard work due to pain. Claimant has no difficulty with focusing on tasks. Claimant has no trouble performing simple manual operations like writing or opening cans or bottles (Exhibit B5F at 2).

On the "Function Report-Adult" dated August 31, 2016, Claimant reports that that from the time she awakens until the time she goes to bed, she gets herself together, attends to personal care, awakens her child, helps him get ready for the day, prepares breakfast, takes her child to school, and picks her child up from school. She does housework and runs errands on some days; however, she allegedly can only return home to rest on others. She prepares or buys lunch and dinner, watches television or reads to the child, and prepares for bed (Exhibit B14E at 1). Claimant's sleep is reportedly disturbed by insomnia, headaches, stress, and overall body pain. Claimant reports that she can attend to her personal care but has some difficulty with dressing, bathing, caring for her

hair, shaving, and bending to use the toilet due to pain and stiffness.  (*Id*. at 2).  She prepares meals daily, sometimes preparing sandwiches, preparing complete meals, warms up frozen meals, or obtains ready-made food.  She does some household chores such as cleaning, laundry, ironing, dishwashing, dusting, and sweeping.  She requires help moving heavy things around.  (*Id*. at 3).  She sometimes goes outside daily.  She drives a car, rides, in a car, or walks when she travels.  She is able to go out alone.  She shops in stores, by phone, by mail, and by computer for items such as groceries, clothes, shoes, books, and household and personal items.  She is able to pay bills, count change, handle a savings account, and use a checkbook.  (*Id*. at 4).  Her hobbies and interests include reading, watching television, doing crafts, and spending time with family.  She spends time talking to other people, going to church, going out to eat, going to the store, visiting others, attending school events, and participating in activities and outings with her child.  (*Id*. at 5).

Claimant's testimony regarding her activities of daily living during hearing testimony on February 15, 2019, are documented in the Transcript of Oral Hearing (Exhibit 26).  That testimony is summarized below in pertinent part.

I live with her ten year old son who has autism.  I have a driver's license and drives my son back and forth to school.  I drive to the grocery store and to the doctor.

I woke up yesterday at 4:00 AM.  It usually takes r a while to get going because  of morning stiffness.  I sit in a recliner in the morning, shower, brush my teeth, fix breakfast, awaken my son, makes sure his clothes are out, get him to the bathroom, and take care of his personal hygiene.  I make sure he gets dressed and eats breakfast.  Then, I drive him to school.  Afterwards, I run errands or go to the grocery store if needed or may go back home and sit in the recliner for about 30 minutes if I'm is having trouble with pain.  I eat breakfast, try to do a little laundry, and do other chores.  I take breaks between chores.  The chores include dishwashing, dusting, light vacuuming, and laundry.  When doing laundry, I usually have to sit down for about 30 minutes.  I'm not able to do a lot of mopping.  I mostly use a Swiffer for wet and dry floors.  I can't do much outdoor work such as mowing the lawn or trimming scrubs at all.  I'm representative payee over my son's benefits, manage his money, and manage his medical care.  I pay household bills.  I pick my son up from school.  I go to church as often as possible, usually at least three times a month depending on how I feel.  Friends and relatives visit me.  I don't not have any problems with her neighbors or others.

Claimant's January 26, 2022, hearing testimony regarding her daily activities is summarized below.

> Fatigue causes me to feel completely exhausted, not having the energy to do anything.  After taking something for fever, I have to rest.  I have to take frequent breaks due to anemia.  I have to rest in a reclining position.  I'm not able to lie flat in a bed and have to sleep in a recliner in a reclining position.  I have difficulty sleeping at night.  It's hard for me to fall asleep, and when I do it is off and on for between two and four hours.  Lack of sleep leaves me exhausted all day.
>
> After careful consideration of the evidence, the undersigned finds that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Claimant's statements concerning the intensity, persistence and limiting effects of  these symptoms are not consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(PageID. 1035-40).

The ALJ proceeded to compare these statements and statements made to her various medical providers with the objective medical findings made upon examination by a number of physicians and noted the many inconsistencies. (PageID. 1040-55). While Todd challenges some of the "inconsistencies" noted by the ALJ, *see* Doc. 16 at pp. 20-21, the bulk of the inconsistencies noted by the ALJ are well-supported in the record. For example, Todd has complained of an inability to perform many daily activities due to pain and fatigue; however, objective examinations by almost all of her doctors over a course of many years have revealed that she has a normal gait, full range of motion in shoulders and knees, 5/5 strength in all extremities, and normal muscle tone. (Page ID. 1040-55). These objective findings belie her contentions of spending much of her time in her recliner.

Having reviewed the evidence and considered the arguments made by Todd and being mindful of the admonishment that the reviewing court may not reweigh the evidence or substitute its judgment for that of the Commissioner, the Court finds that the ALJ's assessment of Todd's subjective statements was supported by substantial

evidence. In this case, the ALJ did not base her decision on any single opinion, but rather, she considered the full record and a variety of factors in evaluating Todd's subjective statements. The ALJ did not totally discount Todd's subjective complaints. Notably, she determined that Todd's RFC was much more limited than the limitations given by most of the doctors who offered opinions on her functional capacity. Accordingly, the Court finds that the ALJ did not err in her evaluation of Todd's subjective statements.

## CONCLUSION

The Court finds that the ALJ's Decision that Todd is not entitled to benefits is supported by substantial evidence and based on proper legal standards. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff Pamela Todd benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **27th** day of **September, 2023**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**